[No. 28423. *En Banc.* November 13, 1941.]

*In the Matter of the Dissolution and Disorganization of*
HORSE HEAVEN IRRIGATION DISTRICT.[1]

[1]Reported in 118 P. (2d) 972.

*Stephen E. Chaffee, B. E. McGregor,* and *Andrew Brown,* for appellants.

*Crowe & Stearns, Charles Snyder, Moulton & Powell,* and *Harcourt M. Taylor,* for respondents.

*James P. Rogers* and *Wright & Wright, amici curiae.*

MILLARD, J.—By this action the parties sought dissolution of Horse Heaven Irrigation District and the distribution of its assets to the persons entitled to receive the same. The action was brought in the superior court for Benton county, pursuant to chapter 79, Laws of 1897, p. 207, as amended by chapter 149, Laws of 1939, p. 447 (Rem. Rev. Stat., §§ 7526-7530 [P. C. §§ 3354-3358]) which provides for the disorganization and liquidation of irrigation districts, which have no bonded indebtedness, and the winding up of the districts' affairs. In the opinion in *State ex rel. Pryor v. Paul,* 5 Wn. (2d) 90, 104 P. (2d) 745, we recited most of the facts leading to the questions presented in the case at bar.

In the case cited, we directed the superior court to retain jurisdiction of the matter and proceed to distribute the trust estate to the persons entitled to share therein. Following the filing of the remittitur, a hear-

ing was had upon the petition of the trustees of the district for instructions respecting the rights of various classes of persons claiming shares in the assets. The court entered an order establishing the right of one class of claimants to participate in the distribution of the assets and denying the right of other classes to participate therein. Those who were denied the right of participation have appealed.

█ The suggestion of *amici curiae* that the appeals should be dismissed upon the ground that the order sought to be here reviewed is not appealable, is without merit.

By the order from which the appeal is prosecuted, the superior court adjudged that only those persons who owned real estate in the Horse Heaven Irrigation District at the time of its dissolution were entitled to share in the distribution of the assets of the district, and that all other persons should be excluded from the distribution. The trial court then ordered that a list of the property holders be prepared and filed with the court, upon which a hearing should be had for the purpose of adjudicating the specific individuals entitled to share, and the proportion which each should receive.

Unless the order from which the appeal is taken comes within the terms of the appeal statute (Rem. Rev. Stat., § 1716 [P. C. § 7290]), it is not an appealable order. The statute (Rem. Rev. Stat., § 1716) provides that any party aggrieved may appeal to the supreme court from the final judgment entered in any action or proceeding.

The order in the case at bar finally determines the class of persons who shall share in the distribution of the assets and excludes other classes. Under the order, there remains for future determination only the adjudication as to specific persons in the class, to which

reference is made in the order, who shall share in the distribution and the proportionate amount which each shall ultimately receive. This appeal brings before this court for review the court's order establishing the class or group of claimants who shall share in the assets. As to this issue, the trial court rendered its final judgment and adjudged that appellants are not entitled to share in the trust estate. The order from which the appeal was taken finally and definitely determines the respective rights of the claimants to participate in the distribution. Upon this phase of the case, the order constitutes a final judgment and is appealable. *Bishop v. Lynch*, 8 Wn. (2d) 278, 111 P. (2d) 996; *Bishop v. Illman*, 9 Wn. (2d) 360, 115 P. (2d) 151.

The questions presented on this appeal involve the distribution of assets of approximately $385,000 in value, of which the directors of the irrigation district find themselves in possession upon final dissolution of the district. The several classes of persons who appeared in the trial court and asserted their claims may be described as: (1) Those who predicate their right to share upon the fact that they at one time paid assessments upon land in the district, although they do not now own any land within the district; (2) those who have at all times owned land within the district and paid assessments; (3) those who now own land within the district, but have paid no assessments thereon because their land was acquired subsequent to the last assessment; (4) those who are assignees of assessment payers; (5) those who are contract purchasers of land within the district; (6) some who have acquired land within the district subsequent to its dissolution.

The pertinent portion of the order entered by the trial court reads as follows:

"It is determined and decreed by the court that it is the duty of the trustees to distribute all assets, lawfully coming into their hands for distribution as a result of the dissolution of Horse Heaven Irrigation District, to the property holders in Horse Heaven Irrigation District and that the term 'property holders', as used in the statute controlling this matter and as used in this order, is now construed for all purposes in connection with this proceeding to mean and to be limited to all persons, including corporations, who, at the time of the entry of the order declaring said district dissolved, owned the lands within the boundaries of the district as said boundaries existed at the time of said dissolution; that the holder of the equitable title to any land is entitled to take as against the holder of the legal title thereto; and that mortgagees or other lien holders, as such, are not entitled to any part thereof; that the rights of said owners to said assets became vested at the time of the entry of said order of dissolution, and any conveyance of said lands thereafter does not of itself, transfer to the grantee the owner's interest in said assets.

"It is further determined and ordered by the court, that assessments have at all times been equal upon all the lands within the district, that the total acreage within the district at the time of its dissolution was approximately 79,932.16 acres and that the distribution to each property holder shall be based upon the proportion the acreage owned by such property holder bears to said total acreage within the district."

The Horse Heaven Irrigation District, comprising approximately 330,000 acres of land, was organized in 1916. In 1917, the electors of the district authorized the issuance of general obligation bonds in the amount of $18,250,000, of which bonds to the value of $222,000 were delivered in payment for certain maps, surveys, water rights, etc. The remainder of the bonds authorized were canceled in 1926. Attempts to enter into contracts for the construction of the contemplated irrigation district were unsuccessful. Assessments

were, however, levied against the lands in the district, and, prior to October, 1933, the district, through foreclosure of irrigation district assessments, had acquired title to all lands within the district except approximately ninety-four thousand acres. The greater proportion of the bonds which had been issued were, with accrued interest, in default. A new bond issue of $120,000 was authorized and sold, and the earlier bonds redeemed. By November, 1938 (excluding lands owned by the United States, the state of Washington, and the district itself), approximately eighty thousand acres within the district remained in private ownership. Pursuant to a notice and petition, the district was dissolved and disorganized by order approved by the superior court January 31, 1939. The former directors of the district were continued as trustees, pursuant to the mandate of this court in *State ex rel. Pryor v. Paul, supra,* and have applied to the court for the distribution of the remaining assets of the district. It was upon a hearing upon that petition that the trial court entered the order from which the appeal was taken. The statute which provides for the dissolution of irrigation districts will be found in Rem. Rev. Stat., § 7526 [P. C. § 3354] *et seq.* Section 7530 [P. C. § 3358], so far as pertinent, reads as follows:

"Upon the disorganization of any irrigation district under the provisions of this chapter, the board of directors at the time of the disorganization shall be trustees of the creditors and of the property holders of said district for the purpose of collecting and paying all indebtedness of said district, in which actual construction work has been done, and shall have the power to sue and be sued. It shall be the duty of said board of directors, and they shall have the power and authority, to levy and collect a tax sufficient to pay all such indebtedness, which tax shall be levied and collected in the manner prescribed by law for the levying and collection of taxes of irrigation districts. Any

balance of moneys of said district remaining over after all outstanding indebtedness and the cost of the proceedings under this act have been paid shall be divided and refunded to the assessment payers in said irrigation district, to each in proportion to the amount contributed by him to the total amount of assessments collected by said district. Said board of directors shall report to the court from time to time as the court may direct, and upon a showing to the court that all indebtedness has been paid, an order shall be entered discharging said board of directors."

It is the position of respondents that, under Rem. Rev. Stat., § 7530, the former directors of the district are trustees for the creditors—there is none—and "of the property holders of said district," as provided in the statute; that the assets of the district are held by the trustees in trust for such property holders and no others, and that only the property holders are entitled to the assets.

Respondent trustees (Messrs. Weller, Williamson, and Hamilton) appear herein by Messrs. Crowe & Stearns and Charles Snyder, their attorneys. Certain property owners, as respondents, appear by Judge Harcourt M. Taylor, their attorney; and other property owners appear by attorneys Messrs. Moulton & Powell. Four members (J. N. Burkhart, Math Swanson, W. C. Travis, and Henson) of this latter group are also appellants before this court, as they own executory contracts of purchase covering land within the district. The trial court held that they, as such contract holders, were not entitled to share in the distribution.

The statute (Rem. Rev. Stat., §§ 7526-7530) which provides for the dissolution of irrigation districts should have effect according to the purpose and intent of the lawmakers. This is a primary rule of construction.

"All the rules should be considered when it is necessary to construe a statute, and no particular rule should be followed to the exclusion of all others when to do so would lead to illogical conclusions." 59 C. J. 944, § 563.

The courts, in pursuance of the general object of giving effect to the intention of the legislature, are not controlled by the literal meaning of the language of the statute, but the spirit or intention of the law prevails over the letter thereof. 59 C. J. 964.

"Since all statutes must be interpreted before they can be applied, might not the rule be announced that all statutes are subject to construction, and if there be more than one possible construction, that meaning will be adopted which most reasonably seems to be the one intended by the legislature, after the court has considered all intrinsic and extrinsic aids? Since in practice this largely represents the method actually pursued by the court in its search for the legislative intent, there should be no real objection to recognizing that which already is a reality." Crawford's Statutory Construction, 283, § 175.

It is a rule of such universal application as to need no citation of sustaining authority that no construction should be given to a statute which leads to gross injustice or absurdity.

Rem. Rev. Stat., § 7530, provides that: (1) The district directors, upon dissolution of the district, become trustees by force of the statute; (2) the district directors are trustees of the "creditors" and of the "property holders" of the district; (3) the district directors are trustees for the purpose of collecting and paying all indebtedness of the district; (4) the trustees are empowered, and it is their duty, to levy and collect a tax sufficient to pay district indebtedness remaining after disorganization; (5) it is the duty of the trustees to divide any money of the district remaining over after the trustees have paid all outstanding indebted-

ness and the cost of proceedings, and to refund such money to the assessment payers in the irrigation district, in proportion to their respective contributions to the total assessments collected by the district; and (6) it is the further duty of the trustees to report to the court, and, upon showing to the court that all indebtedness has been paid, it is the duty of the court to enter an order discharging those trustees.

■ The statute very plainly makes the directors trustees for the creditors and the property holders. It was the undoubted intention of the legislature that the proceeds be distributed among the property holders (the owners) within the district at the time of the dissolution of the district; that is, distribution of the assets of the district must be based upon ownership of land within the boundaries of the district at the time of entry of the order dissolving the district.

By failure to construe the statute as a whole, the result may well be, so far as the *property holders* of the irrigation district are concerned in the distribution of the assets of this dissolved district, that those assets will be distributed to persons who are not owners of the assets of the district; in other words, their property will be taken from them without due process of law. Surely, no such intent should be imputed to the legislature.

■ An irrigation district is a corporation which exercises no governmental functions. It owns and uses its property in a strictly proprietary capacity for the primary benefit of the owners of land included within the district. With the acquisition as owner of land in an irrigation district, that owner immediately acquires an interest in all property of that district. When the district ceases to be a district, the interest of that owner is as definite and certain as is the interest of a

shareholder in an ordinary corporation. Each owner becomes a tenant in common with all other owners.

It is not difficult to comprehend the capacity in which the district owns property and operates if we are mindful of the "last faithful acre" doctrine. In *State ex rel. Wells v. Hartung,* 150 Wash. 590, 274 Pac. 181, and in *Roberts v. Richland Irrigation District,* 169 Wash. 156, 13 P. (2d) 437, 289 U. S. 71, 77 L. Ed. 685, 53 S. Ct. 519, we considered the question of the measure of liability of land in an irrigation district for the payment of bonds issued by the district. We held that the bond of an irrigation district is a general obligation, and that each acre of land within the district remains bound until the debt is paid. The obligation is both primary and secondary; primary in that each acre must pay its proportionate part based upon its benefit, and, secondary, in that each acre must pay, or help to pay, the deficiencies which result from failure of other acres to pay. Under such circumstances, the question arises: What interest is acquired by the owner of the paying land in the nonpaying land when that land becomes property of the district through the foreclosure of delinquent assessments?

All assets of an irrigation district are held by the district for the benefit (1) of the district creditors and (2) of the landowners. If a landowner in the district refuses to pay an assessment of, say, five hundred dollars against his land, that land goes to the district. By his refusal, he imposes the burden of his assessment on all paying landowners. Another landowner may pay one or more assessments and then conclude that it is to his best interest to abandon the land to the district; and in so doing, all future burdens that would have been borne by his land are thrown upon the remaining landowners; thus, the district accumulates what would be termed in the case of an ordinary cor-

poration a reserve or an undivided surplus. That surplus is held by the district for the benefit of those landowners who have continued to pay their assessments and, in addition to their own assessments, have paid those assessments which should have been paid by the abandoned land. What interest one who refuses to pay assessments may claim in the proceeds of the sale of such land, is not an open question in this state. We have decided that district bonds are a general obligation, and that each acre of land remains obligated to pay until the last dollar of debt is discharged.

We held in *Roberts v. Richland Irrigation District, supra,* that the obligation to pay an assessment first levied against one's own land is a primary obligation, and that the obligation to pay an assessment to make up for his neighbor's failure to pay is a secondary obligation; that the district holds the title to the land thus acquired for the benefit of those who have been obligated to pay the secondary obligation.

As the land acquired by the district is held for the benefit of those who meet secondary obligations, it is plain that that benefit can be realized when the land is sold or leased or in any manner produces district revenue. In the event of a sale, the proceeds would be placed in the treasury of the district with the result that the assessment against paying lands would be reduced. It would hardly be contended that any such proceeds should be refunded to former assessment payers. If for any reason the district is unable to sell its land until it discontinues to function, it would surely not be argued that those who transferred it to others, or permitted the land to pass to the district of their own accord, should in equity receive the proceeds. Certainly, only those who remained faithful and paid the continually increasing secondary obligation would be entitled to receive the proceeds.

■ If the formerly enunciated principle, reiterated in *Roberts v. Richland Irrigation District, supra,* is applied, the problem before us is not difficult of solution. The trustees hold the land in trust for those who met the secondary obligation. As those payers of the obligation are entitled to the benefit and have not been able to realize upon that benefit until after dissolution, neither in law nor in equity should they be denied the right to realize then.

As stated above, the irrigation district owns property and operates wholly in a proprietary capacity. Since its property is held for the benefit of the landowners, it should pass to the landowners, not only for the reason that they are the beneficiaries of a trust, but also for the same reasons as those which are controlling in the case of the dissolution of a private corporation. 13 Am. Jur. 1197-1199, § 1352.

To classify one as an "assessment payer" in an irrigation district because he paid perhaps one or more assessments and then abandoned his land two or more decades ago, is to ascribe an intent to the legislature to commit a gross injustice, and such construction would lead to an absurd consequence, from which it will, of course, be presumed that some qualification was intended by the legislature to avoid such conclusion. If the statute had limited the right to vote to "assessment payers" it could not logically be argued that those who ceased payments of their assessments so many years ago could now vote.

Nor is a construction of the statute reasonable which permits one who has not been an assessment payer for more than twenty years, and who received full value for the assessment that he did pay, to share in the refund of a balance to which he did not contribute anything. It should not be forgotten that those who paid their assessments were paying the administration costs

and were also paying for the purchase price of property bought by the district for which bonds were issued. One who was once an assessment payer abandons his land to the district. His neighbors in ever decreasing numbers assumed and met the secondary liability and are now entitled to the land, the abandonment of which created that liability. Each person who purchased land in the district from the date of its organization to the date of its dissolution, assumed the secondary liability and acquired all the title and right of the person from whom he purchased, and with it an interest in the district property.

▇▇ The statute (Rem. Rev. Stat., § 7530) refers to "the assessment payers in said irrigation district" in the present tense. In enacting that statute, the legislature had in contemplation, and was dealing with, a balance left over from assessments levied by the trustees or money remaining out of assessments actually paid by assessment payers. In either case, the payers of the assessments could be determined. All other assets of the district the legislature left to be distributed by the statutory trustees to those who owned the assets to be distributed.

Under the express language of the statute, the title to land at the time of dissolution vested in the trustees for the benefit of the property holders. The only reasonable interpretation of the statute is that it was the intention of the legislature that, if any money came into the hands of the trustees from the payment of assessments levied by them, the money should be refunded to those who paid it, not to those who had paid assessments in the past for lawful and definite purposes, such as the payment of administrative costs and bond service. The money paid by such assessment payers was used for a continuing lawful purpose, and no portion of it enters, either directly or indirectly,

into any money that might have been carried over. If it did, it could without difficulty be found therein. The fact is that practically no money came into the hands of the trustees at the time of dissolution, hence there was no balance of money remaining over out of. the payment of assessments. No assessments were levied subsequent to 1932. The decree confirming dissolution was entered in 1939.

The construction of the statute for which some of the appellants contend is manifestly erroneous because of the impossibility of distribution of assets among assessment payers from the time of the organization of the district in 1916. If we adopted that construction, the trustees would be compelled to find all those who have paid assessments in the past and then abandoned their lands to the district, those who have paid assessments and then sold their lands to others, the heirs and representatives of those who might be dead, and those who still own land in the district and have paid assessments thereon. More than two decades have elapsed since the levy of the first assessment. While the location of those who have paid assessments at various times through that period of time and their heirs might be an impossible task, and such impossibility would not warrant us in declaring the statute void, the situation presented is one that does not warrant us in holding that the legislature ever intended that anything of that kind be done.

Many absurd situations would arise if appellants' construction is adopted by this court. One apt illustration is suggested by counsel: Assume that A owned land in the district at the time of its organization in 1916, and that he paid assessments to the extent of eighty cents an acre, after which he sold his land to B, who paid assessments during the remainder of the assessment-paying period in the amount of approximately

eighty cents an acre. The land was then sold to C, before dissolution but after all assessments had been paid. Let us assume that the district was indebted in some amount at the time of dissolution, and that it had no money to be carried over to the trustees. It was the duty of the trustees to levy an assessment in the amount, we will assume, of ten cents an acre. The trustees performed that duty. This levy, we will further assume, produced enough to pay the debts and a balance of ten thousand dollars to be refunded. The district has no other money or other assets. A and B would each receive eight dollars out of the ten thousand dollar balance to each dollar received therefrom by C, who was the only one of the three who had contributed anything to that balance.

The illustration fairly represents a condition which the legislature would reasonably expect to arise. If a statute construed in one way is incapable of operation, or, if so construed, its operation becomes unreasonable and ridiculous, and if it could possibly bear a construction which makes its operation fair, reasonable, and practical, it must be given the reasonable construction.

To sustain the position of appellants would result in taking from the owners of their property and distributing it among those who lost all right of ownership either by abandonment of the property or by foreclosure for their failure to pay assessments levied against their property—they chose to become no longer *assessment payers*. We should not impute to the legislature an intention to distribute assets to persons who are not owners of those assets, thus taking from the owners their property without due process of law.

■ ■ Appellants J. N. Burkhart, Math Swanson, W. C. Travis, and Dennis Henson seek a modification of the trial court's order relating to the rights of contract holders. Those four appellants were owners of

land within the district at the time of its dissolution. They are in accord with that portion of the trial court's order which directs distribution of all assets of the district to the property holders in the district, who, as construed by the court, are the persons who at the time of the entry of the order declaring the district dissolved owned lands within the then existing boundaries of the district. The four appellants claim, however, that, in addition to their right to share in distribution because of their ownership of property, they are also entitled to share in distribution because at the time of dissolution of the district they were holders of contracts for the purchase of land then within the district, which contracts in some cases have been performed and title taken or are still in effect.

Appellant Burkhart, in addition to being the owner of land within the district at the time of the dissolution of the district, then held a contract for the purchase of land from the owner thereof. Since dissolution, he has paid out the contract and has taken title to the land. He had paid assessments on the land owned by him, but had not paid any assessments on the land then held under contract.

Appellant Dennis Henson's claim is based upon a contract, held by Chester Henson at the time of dissolution of the district, for the purchase from the owner of land then included in the district, which was assigned by Chester Henson to Dennis Henson. The installments due under this contract have been paid, and title to the subject matter of the contract has been conveyed to Dennis Henson.

At the time of dissolution of the district, Math Swanson owned land in the district and also held a contract for the purchase of land then included in the district. This contract has not been fully performed, but it is still in effect and is owned by Math Swanson.

In addition to owning land in the district at the time of dissolution of the district upon which land he had paid assessments, appellant Travis held a contract executed in 1929 for the purchase of land then included in the district, on which land he paid assessments. This contract is still in effect and is owned by appellant Travis. Claimant Travis also holds a contract by assignment from the original purchasers of land purchased from the district on contract, which land was included in the district at the time of dissolution.

The four appellants are interested both as appellants and respondents. If the order under which the assets must be distributed to owners of land in the district at the time of dissolution is not sustained, the claims of appellants as contract holders would fail. Their claims as contract holders will not affect any respondents appearing in this appeal.

Under the trial court's order, it is determined that the holder of the equitable title to any land is entitled to take as against the holder of the legal title thereto; and that mortgagees or other lien holders as such are not entitled to any part thereof; that the rights of

" . . . said owners to said assets became vested at the time of the entry of said order of dissolution, and any conveyance of said lands thereafter does not of itself, transfer to the grantee the owner's interest in said assets."

In *Vandin v. McCleary Timber Co.*, 157 Wash. 635, 289 Pac. 1016, we held that, while under *Ashford v. Reese*, 132 Wash. 649, 233 Pac. 29, an executory contract for the purchase of land vested no title or interest, either legal or equitable, in the vendee until the contract was fully performed, nevertheless an executory contract for the sale of land vested a right in the vendee which the court will enforce at the suit of the vendee. See, also, *Oliver v. McEachran*, 149 Wash. 433, 271 Pac.

93; *State ex rel. Oatey Orchard Co. v. Superior Court,* 154 Wash. 10, 280 Pac. 350.

The contract of each of the four appellant contract purchasers created a right enforcible against the land which is the subject of the contract. As the contract is enforcible against the land which is the subject of the contract, the vendee's right is enforcible against that proportion of the assets to which his vendor is entitled under the trial court's order quoted above.

"Whatever this court may have said heretofore on the question of the effect of such contracts in *Schaefer v. Gregory Co.,* 112 Wash. 408, 192 Pac. 968; *Ashford v. Reese,* 132 Wash. 649, 233 Pac. 29, or *In re Kuhn's Estate,* 132 Wash. 678, 233 Pac. 293, we now say that it creates a right enforceable against the land which is the subject of the contract; a right which cannot be taken away by either the grantor in the contract or by any one, with notice of the contract, claiming under, by or through the grantor, unless for a breach of the conditions of the contract by the grantee.

"It must follow that the interest in the property remaining in the grantors after the execution of the contract to the Richardsons was an incumbered title; that it was a legal title subject to be defeated absolutely by a performance of the contract on the part of the grantees, and subject to be reinstated in full on a breach of the contract. The real beneficial interest remaining in the grantors was the right to receive the payments as they fell due on the contract." *Culmback v. Stevens,* 158 Wash. 675, 291 Pac. 705.

The irrigation district statute provides that the directors of an irrigation district shall, upon dissolution of the district, become trustees for the property holders of the district. The legislature intended by use of the term "property holders" to include within such classification contract purchasers who, to protect their contracts, must pay such assessments as are levied against the land which is the subject of those contracts. The contract purchasers are members of the group which is

really interested in the success of the district; those who have to meet its burdens.

The irrigation district statute (Rem. Rev. Stat., § 7528 [P. C. § 3356]) provides for irrigation district elections by qualified electors of the district and defines as such electors qualified voters under the election laws of the state who hold title or evidence of title to land in the irrigation district.

In *State ex rel. Holt v. Hamilton,* 118 Wash. 91, 202 Pac. 971, we stated that, while it was not necessary to define the legal standing of the contract in that case (it was the ordinary contract for the sale of real property, with the time essence clause and provisions for forfeiture):

"In our opinion, the legislature used the words 'evidence of title' for a purpose, and to permit the people who have written evidence of their right to acquire title, coupled with possession and actual control of the land, the people, who are the ones really interested in the proper operation of the affairs of the district and are the ones who have to meet its burdens, to have a voice in selecting the officers to operate the irrigation district."

The order should be modified to conform to what we have said concerning the rights of the four appellant contract purchasers. In all other respects, the order is affirmed.

ROBINSON, C. J., STEINERT, BLAKE, and JEFFERS, JJ., concur.

BEALS, J. (dissenting)—I am unable to agree with the majority in holding that under the statute the "property holders" of the district, rather than the "assessment payers," are entitled to distribution of the assets remaining in the hands of the trustees. This question is, of course, controlled by the statute, with

238

particular reference to Rem. Rev. Stat., § 7530, the pertinent portion of which reads as follows:

"Upon the disorganization of any irrigation district under the provisions of this chapter, the board of directors at the time of the disorganization shall be trustees of the creditors and of the property holders of said district for the purpose of collecting and paying all indebtedness of said district, in which actual construction work has been done, and shall have the power to sue and be sued. It shall be the duty of said board of directors, and they shall have the power and authority, to levy and collect a tax sufficient to pay all such indebtedness, which tax shall be levied and collected in the manner prescribed by law for the levying and collection of taxes of irrigation districts. Any balance of moneys of said district remaining over after all outstanding indebtedness and the cost of the proceedings under this act have been paid shall be divided and refunded to the assessment payers in said irrigation district, to each in proportion to the amount contributed by him to the total amount of assessments collected by said district."

In this case, we are required to construe this statute, determine the legislative intent, and apply the legislative plan of distribution as contained in the portion of the section above quoted. If the statute provides for a definite plan of distribution, the courts are not concerned with the reasons which actuated the legislature in selecting this particular method; nor are we at liberty to direct a disposition of the assets of the district in accordance with the general principles of equity or of the law applicable to private corporations. The method of distributing the assets must be determined from the provisions of the statute, if any such method can be found outlined therein.

The statute makes the directors of the district "trustees of the creditors and of the property holders of said district for the purpose of collecting and paying all indebtedness of said district." In other words, under

the statute the directors are trustees both for the creditors and the property holders, for the limited purpose of collecting sums due to the district and paying its debts. This portion of the statute does not purport to make the directors trustees, as the majority opinion assumes, for the purpose of distributing to the property holders or to anyone else any assets remaining after the payment of the debts and expenses. After providing for the levy of a tax if necessary, the statute continues by providing for the distribution of any balance of moneys remaining after payment of the debts and the costs of the proceeding for dissolution. No express statutory duties devolve upon the trustees under this portion of the act. The trust, of course, continues, if assets belonging to the district remain after the payment of debts and expenses, for the purpose of distributing such assets to the persons who under the statute are entitled to receive the same. *State ex rel. Pryor v. Paul,* 5 Wn. (2d) 90, 104 P. (2d) 745.

The only direct reference in the statute to the matter of the class or classes of persons who should share in the distribution of the balance of moneys remaining in the hands of the trustees after the payment of debts and expenses, is contained in the last sentence above quoted. This provision of the act is, possibly, not as definite as it might be, but it clearly defines the outer limits of the class to whom the balance shall be distributed. Any such balance of moneys "shall be divided and refunded to the assessment payers in said irrigation district." In this connection, the use of the word "refunded" is significant. The word *refund* is defined by Standard Dictionary as follows: "To pay back; . . . restore; repay." Black's Law Dictionary defines the word as "to repay or restore; to return money had by one party of another." Money can be "refunded" only to one who has paid money on some prior occa-

sion. By this provision of the act, the legislature manifestly intended that, upon dissolution of the district, the "balance of moneys" to which the legislature referred shall be refunded only to persons who have paid assessments during the life of the district. The statutory plan of distribution mentions only *assessment payers*, placing the statutory emphasis upon that class and no other.

It is argued that the "balance of moneys," which must be construed to refer to other assets as well as cash, to be divided and refunded pursuant to § 7530, is limited by the context of that section to moneys remaining in the fund raised by a tax levied by the directors in their capacity as trustees, pursuant to the statute, after paying creditors and the costs of the proceeding, and that the phrase "assessment payers" refers only to persons who paid this final tax levied by the trustees for the purpose of clearing the district from indebtedness and paying the costs of the proceeding by which the district is dissolved.

No such limited construction can be placed upon the last sentence of § 7530. For convenience we again quote this sentence:

"Any balance of moneys of said district remaining over after all outstanding indebtedness and the cost of the proceedings under this act have been paid shall be divided and refunded to the assessment payers in said irrigation district, to each in proportion to the amount contributed by him to the total amount of assessments collected by said district."

The balance of moneys is referred to as "of said district." The proceeds of any tax levied by the directors as trustees, as provided for in the section above referred to, would be moneys in the hands of the trustees, having been collected by them as liquidators, and would not be properly referred to as moneys "of said district."

The sentence above quoted provides for a distribution to "assessment payers," while if the legislature had intended to distribute the fund to those who had paid any tax levied after the disorganization of the district, it would seem probable that the legislature would have provided for a refund to taxpayers, the legislature having referred to the levy as a tax rather than as an assessment.

It is also significant that the fund is allocated with reference "to the total amount of assessments collected by said district." This language is plain, and it is difficult to understand how it could be construed to refer to anything other than the total sum of assessments which the district has collected.

It is apparent that the portion of the statute last above quoted is not limited in its scope to the provision allowing the levy of a liquidating tax. I shall later state my reasons for doubting that the provision was intended to apply to the distribution of any residue of the proceeds of such a tax.

Careful consideration of the language above quoted from § 7530, with particular reference to the last sentence above requoted, convinces me that the section should not be construed so as to limit the distribution to persons paying the tax levied by the directors as trustees after the disorganization of the district. Such a construction of the statute, while providing for the disposal of any residue of the taxes paid, would leave the disposition of such assets as are here to be allocated, a matter of considerable difficulty. Of course, no question is here presented as to the distribution of any fund remaining out of the proceeds of a tax imposed by the trustees in the course of the disorganization of a district after the payment of the indebtedness of the district and the expenses of the proceeding.

I am convinced that the statute covers the matter of

the distribution of any assets of the district such as those which are the subject matter of this litigation, remaining in the custody of the trustees after the disorganization of the district and the payment of debts and expenses, and that the statute applies to the situation presented in the case at bar. The legislative intention that the assessment payers shall receive such assets clearly appears from the statute, and it would seem that the provision that those who have paid the assessments levied by the district shall receive the benefit of any balance remaining after the payment of the indebtedness of the district and the expenses referred to in the statute, is entirely reasonable and not inconsistent with equitable principles.

For the purposes of this portion of the statute, it would seem that one who paid an assessment by contributing his land within the district to the payment thereof has established his right to share in the distribution of the fund to the same extent as one who paid his assessment in money. It follows, then, that the phrase "assessment payers" should include not only those who paid their assessments in cash, but also those who discharged their assessments by suffering foreclosure of their land for failing to pay the same. Such persons should share in the fund only to the extent of assessments which they paid in cash and the amount of the assessments for nonpayment of which their land was foreclosed.

The act places no direct or implied limitation as to the time when the assessments referred to must have been paid, and all persons who have paid assessments levied by the district, whether with land or with money, at any time during the existence of the district, and persons who claim by, through, or under such assessment payers, whether by virtue of assignment, personal representation, or heirship, should be entitled to share

in the balance of moneys above referred to. The right would not pass by sale of the land upon which assessments were paid, unless the contract so provides, the right to share being a separate and independent right of the assessment payer.

It is, of course, true, as stated by the majority, that, if the owner of land within the district fails to pay an assessment levied against his property, the other land within the district may be required to make up all or a portion of the unpaid assessment, but the district then takes over the land against which the assessment was not paid, and that property constitutes assets of the district, and the proceeds will be applied to the payment of the district's obligations. In the case at bar, through foreclosure of unpaid assessment liens against property within its boundaries, the district now finds itself possessed of assets of the value of over $300,000 available for distribution to the persons who, under the statute, are entitled to receive the same.

The majority stress this "last faithful acre" doctrine, as supporting the conclusion that the remaining property holders own the foreclosed lands and the proceeds thereof, upon dissolution of the district. This doctrine would be persuasive in the absence of the statutory provisions of § 7530, but, in my opinion, that section definitely and positively provides for a continuing contingent interest in the residue of foreclosed lands in favor of those who have paid assessments levied by the district. The right is personal to the assessment payer, and does not run with the land. This interest becomes fixed and effective upon dissolution of an irrigation district, under the provisions of Rem. Rev. Stat., §§ 7526-7530 [P. C. §§ 3354-3358]. At that time the owner of the last faithful acre, as well as the owners of other acres, who paid assessments levied by the district, but who for some reason did not continue

faithful to the end, are, under the statute, accorded their just *pro rata* share of the assets of the district. Those who have maintained their land ownership and have paid greater sums by way of assessments receive a larger proportion of the assets, but are not entitled to an exclusive interest therein, and the distribution is determined, not by land ownership, but by payment of assessments.

It is apparently the view of the majority that the legislative plan for distribution of the assets of the district remaining after the payment of the debts and expenses was intended primarily to allocate any excess of funds which might have been accumulated as the proceeds of a tax levied by the trustees pursuant to § 7530, *supra.* It seems that the assumption that there might be a residue remaining of funds raised by such a tax levy after the payment of the debts and expenses underlies, to a considerable extent, the reasoning of the majority in construing the act so as to limit participation in the fund now under consideration, to the current property holders.

That the last sentence of the paragraph of the statute above quoted might present some difficulties of construction, if at some future time the court should be called upon to distribute the residue of a fund raised by a tax levied by the trustees, is not a sufficient reason for reading the words "assessment payers" out of the act. It might well be held that the statutory provision does not apply to such a fund, which was raised by the trustees in the course of the administration of the trust under direction of the court, and that in case such a fund should ever be available for distribution, the court, and not the statute, should control its allocation.

If the majority are of the view that the distribution feature of the statute above quoted applies only to the

allocation of the balance of a fund raised by a liquidation tax levy, then, in considering such a question as is here presented, it should be held that the act does not apply, and that there is no statutory method for allocating such a fund as this.

It seems clear, however, from a study of the act, that it does embrace within its scope such a fund as is now being considered. As applying to such a fund as this, the statute is plain, and its application to such assets as are present in the case at bar is free from difficulty.

The act makes no provision for the creation of any excess funds as the result of the levy of a liquidation tax. The statute vests the trustees with authority "to levy and collect *a tax sufficient to pay all such indebtedness.*" (Italics mine.) The trustees have no power to levy any tax in excess of the amount required to meet the indebtedness, as expressly provided by the statute. A larger levy would be enjoined at the suit of any taxpayer. The legislature having given the trustees no power to raise any excess funds, how can it be said that the legislature contemplated that such funds could be the principal subject matter available for distribution? If any residue should remain in the hands of the trustees as the proceeds of such a tax, the amount of such residue would necessarily be so inconsiderable in amount as to be of little or no consequence.

On the other hand, the situation here presented is one which would naturally be within the contemplation of the legislature, as it might well be that a district which for a while had conducted its irrigation plant successfully, might for some reason desire to dissolve, in which event some fund might be raised from the sale of the assets of the district, and must be allocated to someone. In any event, such a situation has arisen and is here presented, and in my opinion,

246

the statute in plain language provides for the allocation of the assets of the district with which we are here concerned.

In the majority opinion, it is suggested that to accord a share in the distribution of these assets to a property holder who has paid one or two assessments and then forfeited his land to the district, would be to ascribe to the legislature the intent to commit a gross injustice. It may be that one in such a position would have difficulty in stating any particular equitable principle which would entitle him to share in the assets of the district after its dissolution, but granting that, the claim of such a one-time property holder, who actually paid assessments to and for the benefit of the district, to me seems more meritorious than a claim advanced by one who acquired land in the district long after the last assessment was levied, and who has made no contribution whatever to the welfare of the district, or to the fund now being distributed. I find it difficult to understand how a person who acquired title to land within the district only a very short time before its dissolution, can advance any equitable claim to the assets of the district, as opposed to the claim of one who paid assessments levied by the district, thereby contributing *pro tanto* to its maintenance. From the record, it appears that a number of respondents have never paid a dollar of assessments, but under the majority opinion, they will receive a considerable share of the assets of the district. Recognizing that a choice must be made between "property holders" and "assessment payers," it seems to me far more inequitable to allow such property holders to participate in the distribution of the assets, than to allow assessment payers, the forfeiture of whose lands created the very assets now being distributed, to share therein.

Supposed equities, however, should not prevail over

clear statutory provisions. In the first part of the portion of § 7530 above quoted, the legislature referred to property holders. The meaning of that term is clear. In the last portion of the paragraph, and in that portion thereof referring to a new matter not previously discussed, to wit, the distribution of the assets of the district remaining after the payment of debts, etc., the legislature introduced a new class, "the assessment payers," and made the legislative intent clearer by providing for distribution of the assets

"  .  .  . to the assessment payers in said irrigation district, to each in proportion to the amount contributed by him to the total amount of assessments collected by said district."

Language cannot be plainer. If the legislature had intended a distribution to the property holders as such, the distribution would probably have been by acreage owned, but by the statute the distribution is ordered in proportion to the amount contributed by way of assessments. The construction placed upon the act by the majority completely reads out of the statute the last sentence of the paragraph quoted.

Nor does it appear that any particular difficulty would be met in distributing the assets to assessment payers. The statute establishes the right of the assessment payers to share in the assets, but it does not impose upon the trustees any duty to locate and notify each assessment payer of his right. A published notice requiring all assessment payers to present their claims within a specified time would afford a sufficient basis for holding that those who did not so present their claims would be foreclosed from thereafter claiming the right to share in the assets.

For the reasons assigned, I dissent from the conclusion reached by the majority.

MAIN, SIMPSON, and DRIVER, JJ., concur with BEALS, J.